UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

JEFF DAVIS O/B/O )
ELIZABETH HOWARD (Deceased) )
) NO. 2:10-CV-219
V. )
)
MICHAEL J. ASTRUE, )
Commissioner of Social Security )

REPORT AND RECOMMENDATION

The matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation. The applications under the Social Security Act for Disability Insurance Benefits and Supplemental Security Income of Elizabeth Howard, the decedent, were denied following an a hearing before an Administrative Law Judge ["ALJ"]. Both the plaintiff and the defendant Commissioner have filed dispositive Motions [Docs. 11 and 18].

The sole function of this Court in making this review is to determine whether the findings of the Secretary are supported by substantial evidence in the record. *McCormick v. Secretary of Health & Human Services*, 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Comm.*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Secretary's decision

must stand if supported by substantial evidence. *Listenbee v. Secretary of Health and Human Services*, 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

Ms. Howard was 34 years of age at the time of her hearing before the Administrative Law Judge. She had a high school education. Her past relevant work activity was as an LPN and caretaker. She alleged severe impairments of back, neck and hip pain; kidney stones; gallbladder problems; bronchitis; gynecological problems; depression; anxiety; bipolar disorder; and post traumatic stress disorder.

The plaintiff did not take issue with the ALJ's determination of the plaintiff's physical residual functional capacity, and any argument with respect thereto is waived. The record evidence relating to the plaintiff's mental impairments is accurately summarized in the Commissioner's brief as follows:

> In June 2006, Howard began to see psychiatrist Dr. Timothy Sullivan complaining of anxiety, panic, depression, mood swings, and obsessive/compulsive behaviors (Tr. 385). She was taking psychological medication and she reported visiting the emergency room on many occasions due to panic attacks (Tr. 385). Dr. Sullivan gave Howard medication and diagnosed her with bipolar I disorder (most recent episode severe, with psychotic features), panic disorder, generalized anxiety disorder, posttraumatic stress disorder, and obsessive/compulsive disorder (Tr. 385-86). Two months later, Howard reported that she felt better when she took her medications, however, she had stopped (but wanted to resume) taking them (Tr. 388).
> In December 2006, consultative psychologist Alice Garland examined Howard and opined that Howard "appear[ed]" moderately limited in her ability to persist, concentrate, adapt, and work with the public, and that Howard "may have" moderate difficulty with detailed and complex work (Tr. 226). Ms. Garland also commented that Howard's statements were sometimes contradictory (Tr. 225).
> That same month, in December 2006, Dr. Dorothy P. Tucker reviewed

2

Howard's records for the state agency (Tr. 227-243). She opined that Howard had a mild restriction of activities of daily living and moderate difficulties in maintaining social functioning and concentration, persistence, and pace (Tr. 237). Dr. Tucker opined that Howard could understand, remember, and sustain concentration for simple and low level tasks (Tr. 243). She also wrote that Howard would experience some, but not substantial, difficulty in recognizing hazards, or interacting with the public, supervisors, and co-workers (Tr. 243). In addition, Dr. Tucker indicated that Howard could set limited goals and adapt to infrequent change (Tr. 243).

Over the next six months, Howard reported doing quite well on her psychiatric medications, with no side effects (Tr. 393, 397).

In June 2007, psychologist Donna Abbott examined Howard for the state agency (Tr. 304-314). In a report co-signed by Dr. Charlton S. Stanley, Ms. Abbott assessed Howard as having moderate limitations in her adaptive skills, but also noted that Howard could concentrate, maintain a routine, work in the proximity of others, and set and achieve goals (Tr. 313). Howard reported doing laundry, cooking, and cleaning off and on, and (on a good day) would garden, play with her cat, and cook, but usually did not go to the grocery store (Tr. 312). Howard also said that she attended classes on money management and classes on weight control (Tr. 312). Ms. Abbott opined that Howard was a bit overly dramatic with some possible exaggeration of symptoms (Tr. 310). She assessed Howard as having a fair prognosis and a Global Assessment of Functioning ("GAF") score of 58 (indicating "Moderate symptoms . . . . OR moderate difficulty in social, occupational, or school functioning") (Tr. 313).

One month later, in July 2007, Dr. Thomas D. Neilson reviewed Howard's records for the state agency (Tr. 316-333). He opined that Howard had mild restrictions of activities of daily living and moderate difficulties in maintaining social functioning and concentration, persistence, and pace (Tr. 326). Dr. Neilson then assessed Howard as able to understand and remember simple and lower level tasks, as well as having limited, but adequate, ability to sustain concentration, persistence, or pace for those tasks (Tr. 332). He further wrote that Howard could interact with the general public, supervisors, and co-workers with some difficulty and could adapt to gradual, infrequent change (Tr. 332).

Two months later, in September 2007, Howard reported doing fairly well, with no medication side-effects (Tr. 399), but then complained of racing thoughts and mood swings in November 2007 (Tr. 401).

Also in June 2008, Dr. Frank D. Kupstas reviewed Howard's records for the state agency (Tr. 351-367). He opined that Howard had moderate restrictions in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace (Tr. 361). Dr. Kupstas then assessed Howard as able to respond to routine changes and sustain concentration, persistence, and pace for simple tasks (Tr. 367). He also wrote that Howard could, with some difficulty at times, interact with the public, as well as sustain concentration, persistence, and pace for detailed tasks (Tr. 367).

Four months later, Howard complained of increased symptoms since her

3

brother's death and the resulting family stress (Tr. 415). Although a social worker noted that Howard's mood was depressed at first, Howard's mood later became normal (Tr. 415). Howard reported that her symptoms were much improved with her medications (Tr. 415).

In December 2008, Dr. Rebecca Joslin reviewed Howard's records for the state agency (Tr. 429-445). She opined that Howard had a mild restriction of activities of daily living and moderate difficulties in maintaining social functioning and concentration, persistence, and pace (Tr. 439). Dr. Joslin then assessed Howard as able to understand and remember simple and detailed instructions (Tr. 445). She also thought that "with some difficulty," Howard could maintain attention, concentration, persistence, and pace; interact appropriately with the general public; and adapt to change (Tr. 445).

In April 2009, consultative psychologist Dr. Roy Nevils examined Howard for the state agency (Tr. 450-58). Dr. Nevils administered testing that showed six primary scales in the probable range of malingering, and one primary scale — reports of severity of symptoms — in the definite range of malingering (Tr. 453). Dr. Nevils reported that with four or more scales in the probable range or above, the likelihood of feigning was considered 100 percent (Tr. 453). Also, under that test, a score of 76 or above is considered malingering (Tr. 453). Howard's total raw score was 147 (Tr. 453).

Dr. Nevils administered another test which also showed a strong likelihood that Howard was exaggerating her symptoms (Tr. 453). Dr. Nevils opined that the two tests taken together "indicated a definite likelihood of exaggeration of symptomatology" (Tr. 453).

Dr. Nevils opined that Howard had depressive disorder, anxiety attacks, and a GAF score of 55 (indicating "Moderate Symptoms . . . . OR moderate difficulty in social, occupational, or school functioning") (Tr. 453). He also assessed moderate limitations (i.e. "more than a slight limitation in this area but the individual is still able to function satisfactorily") in Howard's ability to interact appropriately with the public, supervisors, and co-workers (Tr. 456-57). Dr. Nevils further wrote that Howard had mild limitations in her ability to understand, remember, and carry out complex instructions, as well as make judgments on complex work-related decisions (Tr. 456). He also assessed Howard as having no limitations in her ability to understand and remember simple instructions, carry out simple instructions, make adjustments on simple work-related decisions, or respond appropriately to usual work situations as well as changes in a routine work setting (Tr. 456).

Three months later, in July 2009, Howard said that she was doing pretty well on her medications, although she was not compliant with therapy (Tr. 534).

[Doc. 19, pgs. 3-7].

At the administrative hearing, the ALJ took the testimony of Vocational Expert

4

["VE"] Adrian Bentley Hankins. The ALJ first asked Mr. Hankins to assume that a person had had the physical residual functional capacity opined in the report of Dr. Marianne E. Filka, M.D., who consultatively examined the plaintiff at the request of the Commissioner.[1] Mr. Hankins was then asked if there were jobs a person with that physical capacity could perform. Mr. Hankins opined that there would be "at least twelve to fifteen million jobs in the national economy, and about four to five hundred thousand in the State of Tennessee." Examples were assemblers, sorters, checkers, weighers, laundry, dry-cleaning workers, garment pressers and various other types of production work." (Tr. 46).

The ALJ then asked Mr. Hankins to assume that the person who had the physical capacity opined by Dr. Filka also had "the non-exertional limitations" set forth in the opinion of Dr. Nevils (Tr. 450-457). Mr. Hankins stated the inclusion of those limitations "would not change my opinion based on the first hypothetical." (Tr. 46-47).

Mr. Hankins was then cross-examined by Ms. Howard's counsel. He asked Mr. Hankins if he was familiar with the "number of moderate limitations in several key areas" set forth in the opinion of non-examining state agency psychologist Frank D. Kupstas, (Tr. 365-67). Mr. Hankins stated that he was. Counsel then asked Mr. Hankins "if we added those limitations to the first or second hypotheticals would it change your answer?" Mr. Hankins stated that it would change his answer and that "there would be a significantly reduced amount of jobs." Mr. Hankins then explained that the reduction in the number of jobs "would really depend on the extent" of "some of those moderate limitations." He stated

---

[1]Dr. Filka's report of her examination of Ms. Howard and her functional capacity assessment are in the record at Tr. 459-471. Once again, plaintiff does not challenge the finding regarding her physical functional capacity.

5

that "if it was a doctor's opinion that they would miss...more than one day a month, and/or have to take more than the usual and customary rest periods during a day...then I would know of no jobs that she could do."

In his administrative decision, the ALJ found that Ms. Howard had severe impairments of back, neck and hip pain, along with depression and anxiety. He also found that none of her other alleged impairments were severe as defined in the regulations. With respect to her assertions of severe impairments of Bipolar Disorder and PTSD, he sated "the medical evidence of record does not document that the claimant has been diagnosed or treated for a Bipolar disorder or for Post Traumatic Stress Disorder." (Tr. 29). He found that the she was not entirely credible. In making this finding, he cited Ms. Howard's reported activities. He also relied upon Dr. Nevils' testing which strongly suggested malingering and exaggerated symptoms. He also was influenced by the treatment note of Dr. Paul B. Cardali, one of her treating physicians (Tr. 249). Dr. Cardali reported that he was contacted by Dr. Harris, another physician, who reported that Ms. Howard had presented to his office seeking narcotic pain medication. He would only prescribe non-narcotic pain relievers and physical therapy. Dr. Cardali stated that Dr. Harris' staff found the prescriptions for the medications and the physical therapy wadded up and discarded in the parking lot in front of his office. For all of these reasons, the ALJ found that she was less than credible regarding the severity of her symptoms. (Tr. 30).

With respect to the findings of the State Agency, the ALJ stated that he noted them "and finds that these opinions are consistent with the finding that the claimant is not disabled and finds that these findings are not inconsistent with the findings of the Administrative Law

Judge." (Tr. 30). Based upon the testimony of Mr. Hankins, the VE, he found that there were a substantial number of jobs which the decedent could perform. Accordingly, he found that she was not disabled. (Tr. 31-32).

Plaintiff asserts that the ALJ erred in adopting Dr. Nevils' assessment as the mental component of Ms. Howard's RFC because "as noted by the Vocational Expert, Dr. Nevils did not provide any specific restrictions which would affect (Ms. Howard's) ability to work." [Doc. 12, pg. 11]. He also asserts that the ALJ erred by failing to properly address other mental assessments in the record, which he states makes it "impossible" for this Court to evaluate whether or not the ALJ's finding was supported by substantial evidence.

In the opinion of this Court, the ALJ did precisely what he was required to do, which was gather evidence to determine the nature and severity of Ms. Howard's asserted mental limitations. He was certainly not "stuck" with the consultative examinations of Ms. Garland or Dr. Stanley, and opted to obtain a third consultative exam by Dr. Nevils, which, as the ALJ noted, included extensive psychological testing. Ms. Garland and Dr. Stanley both based their moderate limitations solely on the mental status evaluations which they performed. In other words, they had a conversation with Ms. Howard about how she was feeling and what had happened in her life to make her that way. Not to belittle a mental status evaluation as a diagnostic or treatment tool, but testing adds much to the equation when attempting to opine on a person's functional capacity and veracity. The ALJ could have discussed the weight he gave to the other consultative examiners, but he did affirmatively state that Dr. Nevils' opinion included testing, and that testing showed Dr. Nevils conclusively that Ms. Howard was "feigning" symptoms and that there was a "strong

7

likelihood" of malingering and exaggerating symptoms. (Tr. 453).

The argument that the ALJ misplaced his reliance on Dr. Nevils' report because it did not contain "specific restrictions" is confusing. His medical source statement sets out his opinion on Ms. Howard's degree of restriction six areas relating to her ability to understand, remember, and carry out instructions, and in four areas relating to her ability to interact and to respond to changes in the work setting. The form defines the rating categories of "none," "mild," "moderate," "marked," and "extreme." (Tr. 456-57). The Court does not see how this is different from other such evaluations in myriad other Social Security appeals. If the plaintiff here is demanding a level of detail such as "this individual may miss two days of work per month," or "this individual might have a panic attack if asked to perform a complex task," there is no support for such a requirement. If he asserts that the ALJ could not frame the mental RFC by saying "I find that it's what is in Dr. Nevils' report," then the plaintiff is again incorrect. There is absolutely no doubt as to the ALJ's perceived degree of restriction and its source. Dr. Nevils' assessment is substantial evidence.

Plaintiff also asserts that the ALJ did not properly evaluate and take into account the opinions of the State Agency psychologists, particularly Dr. Kupstas. The ALJ found that the opinions of Dr. Kupstas and the others were "not inconsistent" with the ALJ's findings. While Dr. Kupstas did mark "moderate" on the first section of the assessment form for areas of functioning that Dr. Nevils did not, the important part of his report is not to be found there.

The form consists of three parts. In Part I, the Summary Conclusions, the State Agency psychologist or psychiatrist is to "record summary conclusions derived from the evidence in file...." with respect to the four areas of mental functioning which affect the

8

capacity to work. These are "understanding and memory," "sustained concentration and persistence," " social interaction," and "adaptation." However, the form instructs the doctor that "detailed explanation of the degree of limitation for each category (A through D), as well as any other assessment information you deem appropriate, is to be recorded in Section III (Functional Capacity Assessment)." (Tr. 365).

Part II of the form, entitled "Remarks," is only to be filed out if the evaluator does not have sufficient documentation to perform the assessment. In this case, as in most, this portion was left blank. (Tr. 366). Part III of the form, the Functional Capacity Assessment, is to be completed "only after the Summary Conclusions section has been completed." In it, the evaluator is to "explain [his or her] summary conclusions in narrative form."

The Social Security Program Operations Manual System ["POMS"] states that the summary conclusions, Section I of the assessment form, "is merely a worksheet to aid in deciding the presence and degree of functional limitations and the adequacy of documentation and does not constitute the RFC assessment." POMS DI 24510.060, found at secure.ssa.gov/poms.nfs/Inx/0424510060. This directive goes on to state that Section III, the Functional Capcity Assessment is "the actual mental RFC...explaining the conclusions indicated in Section I, in terms of the extent to which these mental capacities or functions could or could not be performed in work settings." Thus, Section I is used by the evaluating mental health professional to note the *existence* of a limitation in some area of functioning. The *degree* to which this limitation affects the ability to work is to be described, or "explained" if you will, in Section III. Thus, Section III "trumps" Section I. Of course, if the findings in Section III were totally at odds with Section I, this would detract from the

9

value of the opinion expressed.

In Section III, Dr. Kupstas stated that Ms. Howard was "able to sustain CPP (concentration, persistence and pace) over extended periods for simple tasks. Detailed w/some difficulty at times." She was "able to interact w/general public w/some difficulty at times." She was "able to respond to routine changes." (Tr. 367). These findings are not at severe odds with Dr. Nevils' opinion or the finding of the ALJ that Ms. Howard was not disabled.

Finally, Dr. Nevils' conducted his examination and testing and prepared his report 10 months after Dr. Kupstas did his non-examining review of the record and opinion. Dr. Kupstas did not have the benefit of Dr. Nevils' opinion and Ms. Howard's test results when he did his assessment.

Once again, Dr. Nevils' opinion is substantial evidence for the ALJ's RFC finding. The Court has no trouble recognizing it as such.

The Court would note one inaccurate statement in the ALJ's hearing decision, which was brought to the Court's attention in the Commissioner's recitation of the facts incorporated above. The ALJ stated that "the medical evidence of record does not document that the claimant has been diagnosed or treated for a Bipolar disporder or for Post Traumatic Stress Disorder." (Tr. 29). In fact, Dr. Timothy Sullivan diagnosed and treated her as to both conditions (Tr. 385-86). However, in this instance, the ALJ's failure to include these conditions in his findings of severe mental impairments, or to state why he though they were not severe, is harmless error. It is harmless because Dr. Nevils' opinion of Ms. Howard's residual functional capacity is strong substantial evidence of what conditions Ms. Howard

10

had, and what she could do despite her mental impairments. A mere diagnosis does not establish a disability or in most cases the severity of an impairment.

As previously stated, there is substantial evidence to support the ALJ's RFC finding and his question to the VE. Accordingly, it is respectfully recommended that the plaintiff's Motion for Summary Judgment [Doc. 11] be DENIED, and the defendant Commissioner's Motion for Summary Judgment [Doc. 18] be GRANTED.[2]

Respectfully submitted:

   s/ Dennis H. Inman
United States Magistrate Judge

---

[2] Any objections to this report and recommendation must be filed within fourteen (14) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).